UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ABIGAIL BRENNAN,

       Plaintiff,

v.

METROPOLITAN PROPERTY AND
CASUALTY INSURANCE COMPANY,

       Defendant.

Civ. A. No. 21-CV-10526-DLC

## MEMORANDUM REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Abigail Brennan has brought an action against her property insurer, defendant Metropolitan Property and Casualty Insurance Company (Metropolitan), for its handling of claims she submitted following a fire in her condominium building. Both parties have moved for judgment[1]. (D. 16, 18). For the reasons set forth below, the plaintiff's motion is denied and the defendant's motion is allowed in part and denied in part.

## I.   STATEMENT OF FACTS

Brennan at all relevant times owned a condominium in the Old Reading Schoolhouse Condos (ORSC), and obtained property insurance through a policy first issued by Metropolitan in 2016. (D. 20,

---

[1]The plaintiff characterizes her motion as one for judgment on the pleadings but the court chooses to treat it as one for summary judgment where the plaintiff has also submitted several exhibits in opposing the defendant's motion for summary judgment. *See* Fed. R. Civ. P. 12(c); *Smartling, Inc. v. Skawa Innovation Ltd.*, 358 F. Supp. 3d 124, 137 n.4 (D. Mass. 2019).

Defendant's Statement of Material Facts of Record as to Which There is No Genuine Issue to be Tried (Def. SOF) ¶ 1).  The policy ran from late July to late July and was subject to annual renewal. (D. 16, Plaintiff's Motion for Judgment on the Pleadings (Pl. MJP) Exh. 1 at 1, 38).

In June 2017, the ORSC sustained significant fire damage throughout the complex, including common areas.  When damage occurs to the common area of a condominium complex, condominium associations sometimes issue charges known as loss assessments to the condominium owners to cover the costs of repair.  The plaintiff's policy provided benefits for loss assessments as follows:

> **Loss Assessment:  We** will pay up to $1000 for **your** share of any loss assessment charged during the policy period against **you** by a corporation or association of property owners.  This coverage applies only to loss assessments charged against **you** as owner or tenant of the **residence premises.**
>
> If Increased Loss Assessment is shown in the Declarations, then the $1000 limit is increased to the amount shown.
>
> This only applies when the assessment is made as a result of each direct loss to the property, owned by all members collectively, caused by peril covered . . . .
>
> Regardless of the number of assessments, the limit referenced above is the most **we** will pay with respect to any one loss.

(Def. SOF ¶ 28) (emphasis in original).  At the time of the fire, the plaintiff had the standard $1,000 of loss assessment coverage. (*Id.* ¶ 6).

On or about July 15, 2017, Metropolitan renewed Brennan's policy for one year.  (D. 1, Complaint (Compl.) ¶ 13).[2]  During the term of this policy, on February 8, 2018, Metropolitan agreed to increase the plaintiff's loss assessment coverage from $1,000 to $50,000 for an increased premium of $10 per year.  (*Id.* ¶¶ 14-18; Def. SOF ¶ 7).

In July 2018, the plaintiff renewed the policy for another year, keeping the $50,000 in loss assessment coverage.  (Compl. ¶ 21-22).  During the term of this policy, on February 20, 2019, the management company for the ORSC informed Brennan of a loss assessment (First Loss Assessment) of $84,124.00 for general losses sustained in the 2017 fire.  The defendant does not admit this allegation but does admit that Brennan submitted a claim for the First Loss Assessment for the full amount of her coverage on or about May 2, 2019.  (*Id.* ¶ 25).

Metropolitan took approximately six months to approve the plaintiff's claim, but it did eventually pay her a $50,000 benefit under the policy for the First Loss Assessment.  Metropolitan says six months was necessary because it needed to investigate whether Brennan knew she would receive an assessment prior to obtaining increased loss assessment coverage in February 2018.  Other ORSC

---

[2] The plaintiff's statement of facts sets forth legal arguments rather than facts and to that extent have not been relied upon.  However, the court will consider as undisputed facts those allegations of the complaint to which the defendant has admitted.

unit owners insured by Metropolitan had expressed prior to February 2018 that they knew an assessment was coming from ORSC. (*Id.* ¶¶ 10-13). If Brennan had pre-existing knowledge of such an assessment, her coverage would be voided as a known liability.

Brennan, however, contends that Metropolitan never told her it was investigating whether she had pre-existing knowledge of the assessment, and she was not aware of Metropolitan's proffered justification for the delay until she instituted this litigation. She asserts that Metropolitan instead engaged in unfair delay tactics in an effort to avoid paying her more than $1,000 for the First Loss Assessment. First, Metropolitan tried to convince her that she had only $1,000 in loss assessment coverage based on her coverage amount on the date of the fire. (D. 21, Plaintiff's Memorandum in Opposition to Defendant's Cross-Motion for Summary Judgment (Pl. Opp.) Exh. 2). It also sent her a check for $1,000 and claimed it was for the loss assessment even though the check documentation stated it was for direct coverage for damages to her condominium unit. (*Id.* Exh. 4-5).

In June 2019, Metropolitan informed Brennan that its legal department was examining whether the $50,000 benefit would apply to her assessment. (*Id.* Exh. 7). Metropolitan then told the plaintiff that she would need to file a separate claim for the loss assessment under her 2018-19 policy; apparently, she had

initially filed the claim under the 2016-17 policy since the fire occurred then.  (*Id.* Exh. 8).

Metropolitan contacted Brennan on July 24, 2019, to tell her the legal department had rendered an opinion on her coverage, but the claims representative said he needed some clarification to explain the opinion and would get such clarification the following day.  (*Id.* Exh. 9).  After Brennan did not hear back the following day, she contacted Metropolitan on July 26 and 30.  (*Id.*).  Despite telling the plaintiff that a legal opinion had been rendered by July 24, Metropolitan responded on July 31 that the coverage issue was still being reviewed.  (*Id.* Exh. 10).

On August 6, 2019, the Metropolitan claims representative informed Brennan that the legal department had advised him to pay only $1000 and that Metropolitan would contact her the following week.  (*Id.* Exh. 12).  When she again did not hear from Metropolitan, she requested an update on August 19, 2019.  (*Id.* Exh. 14).

Metropolitan wrote back that her claim was still being reviewed and then requested that Brennan submit various documents, including all ORSC association minutes of meetings since the fire and all correspondence from the ORSC management company.  (*Id.* Exh. 15).  Finally, Metropolitan demanded an examination of Brennan under oath, referencing only her claim number for damage to her condominium unit.  (*Id.* Exh. 17).  Only after this examination did

Metropolitan conclude that Brennan had $50,000 in loss assessment coverage and pay her the remaining $49,000 benefit.

Despite the delay in paying the First Loss Assessment under the 2018-19 policy, Metropolitan let Brennan renew her policy in July 2019 and again purchase $50,000 in loss assessment coverage. (Compl. ¶¶ 102-03). However, on May 21, 2020, Metropolitan told Brennan it could no longer renew her policy because of her significant fire and loss assessment claims. (Id. ¶ 109).

On May 29, 2020, the plaintiff received a second loss assessment for the 2017 fire damage (Second Loss Assessment) of $75,000 from the ORSC. (Id. ¶ 110).[3] The plaintiff filed a claim but the defendant denied it on the ground that the policy limited coverage to $50,000 for any one loss and the plaintiff had already received $50,000 related to the 2017 fire through the First Loss Assessment. (Pl. MJP Exh. 10).

Brennan contended, however, that her loss assessment limit reset with each policy term and she consequently was entitled to collect an additional $50,000 in benefits for the Second Loss Assessment where it came during a different policy period than the First Loss Assessment. After further conversations between the parties failed to resolve this dispute, the plaintiff's attorney sent a demand letter to Metropolitan on October 1, 2020, pursuant

---

[3] Again, while Metropolitan denies this allegation, it admits that it denied the plaintiff's claim arising from the alleged assessment. (D. 7, Answer ¶ 113).

to M.G.L. c. 93A.    (Pl. MJP Exh. 9).    On October 9, 2020,
Metropolitan rejected the demand and this lawsuit followed.

## II.    **THE COMPLAINT**

The complaint asserts four causes of action.  Count I seeks
a declaratory judgment that Metropolitan is obligated to pay
Brennan $50,000 for the Second Loss Assessment under her 2019-20
insurance policy; Count II alleges breach of the insurance contract
for Metropolitan's refusal to pay Brennan $50,000 for the Second
Loss Assessment; Count III alleges that Metropolitan employed
unfair and deceptive settlement practices under M.G.L. c. 93A, §
9, based on both the First and Second Loss Assessments; and Count
IV alleges that Metropolitan breached the implied covenant of good
faith and fair dealing based on its delay in paying the First Loss
Assessment and its failure to pay on the Second Loss Assessment.

The plaintiff moves for judgment on Counts I and II, and on
Count III with respect to the portion of the claim regarding
Metropolitan's handling of the Second Loss Assessment.  (D. 1,
16).  The defendant opposes and cross-moves for summary judgment
on all counts of the complaint.  (D. 18).

## III. **STANDARD OF REVIEW**

Summary judgment is appropriate when the moving party "shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a).  A fact is material if it "might affect the outcome of

the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"'Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed.'" *Cummings Props., LLC v. Pub. Serv. Ins. Co.*, 343 F. Supp. 3d 1, 2 (D. Mass. 2018) (quoting *Ferguson v. Gen. Star Indem. Co.*, 582 F. Supp. 2d 91, 98 (D. Mass. 2008) (alteration in original)). When dealing with cross-motions for summary judgment, a court must evaluate each motion independently to determine whether the moving party has met its burden under Rule 56. *Id.*

## IV. **DISCUSSION**

### A. **Counts I and II**

The plaintiff contends that the 2019-2020 policy entitled her to collect $50,000 for the Second Loss Assessment imposed in May 2020. Count I seeks a declaratory judgment to that effect and Count II alleges a breach of contract for the defendant's failure to so pay. The parties dispute whether the policy's limitation provision foreclosed the plaintiff from collecting benefits where

she had previously collected benefits following the First Loss Assessment.

A court's first step in evaluating a contract claim is to determine whether the relevant contract language is ambiguous. *Barclays Bank PLC v. Poynter*, 710 F.3d 16, 21 (1st Cir. 2013). Whether a contract is ambiguous is a question of law for the court to decide. *See Lohnes v. Level 3 Comm'cns, Inc.*, 272 F.3d 49, 53 (1st Cir. 2001). "'To answer the ambiguity question, the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties.'" *Consolo v. Bank of America*, Civ. A. No. 15-11840, 2017 WL 1739171, at * 3 (D. Mass. May 2, 2017)(quoting *Bank v. Thermo Elemental Inc.*, 451 Mass. 638, 648 (2008)). "An agreement is not ambiguous merely because 'a controversy exists between the parties, each favoring an interpretation contrary to the other,' or because a word has multiple dictionary definitions." *PhoneDOCTORx, LLC v. Healthbridge Mgmt., Inc.*, 58 F. Supp. 3d 152, 160 (D. Mass. 2014) (quoting *Citation Ins. Co. v. Gomez*, 426 Mass. 379, 381 (1998)). Rather, a contract is ambiguous when its terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to its meaning. *Local 369 Util. Workers v. NSTAR Elec. & Gas Corp.*, 317 F. Supp. 2d 69, 73 (D. Mass. 2004); *see also Henry v. Nat'l Geographic Soc'y*, 147 F. Supp. 2d 16, 19

(D. Mass. 2001)(quoting *Lanier Prof. Serv., Inc. v. Ricci*, 192
F.3d 1, 4 (1st Cir. 1999)) ("Under Massachusetts law, a contract
term is ambiguous where its language is 'reasonably prone to
different interpretations or susceptible to differing, but
nonetheless, plausible constructions.'").  "If the contractual
language is ambiguous, a fact finder must resolve the ambiguity by
considering the factual evidence offered by the parties to support
their differing interpretations." *Id.* at 20 (*citing* Lanier, 192
F.3d at 4).

Here, the 2019-2020 policy entitles the plaintiff to collect
"up to [$50,000] for [her] share of any loss assessment charged
during the policy period," but goes on to declare that "the limit
referenced above" is the most the insurer will pay with respect to
any one loss, regardless of the number of assessments.  The parties
dispute whether the policy includes loss assessments that were
charged and covered during prior policy periods for purposes of
determining whether this $50,000 cap has been reached.

The plaintiff argues that the 2019-2020 policy does not take
loss assessments charged during prior policy periods into
consideration.  The plaintiff contends that the policy must be
read literally and as a standalone contract wholly separate and
distinct from the 2018-2019 policy (or any other policy).  The
plaintiff notes that the policy provides, simply and
unambiguously, that the insurer will pay up to $50,000 "for any

loss assessment charged during the policy period." The plaintiff, relying on this language, argues that she is entitled to recover up to $50,000 because she was charged with a $75,000 loss assessment for the fire during the 2019-2020 policy period. The plaintiff acknowledges that she previously recovered $50,000 for the same fire for a loss assessment charged during the 2018-2019 policy, but argues that this fact is immaterial because the policy by its terms narrowly and explicitly ties the $50,000 limit to a "loss assessment *charged during the policy period.*" The plaintiff argues that because she has not yet received any benefits for a loss assessment charged during the 2019-2020 policy period, she is entitled to collect benefits under the policy for the Second Loss Assessment. Alternatively, the plaintiff argues that she is entitled to collect benefits even assuming the policy is found to be ambiguous, because she has proffered a "rational interpretation" of the policy language. *See Hakim v. Mass. Insurers' Insolvency Fund*, 424 Mass. 275, 281 (1997) (insured entitled to benefit of more favorable interpretation where more than one rational interpretation of policy language exists).

The defendant argues that the limitation provision must be read to encompass payments made for loss assessments charged during a prior policy period because to interpret it any other way would render the policy's limitation language meaningless and allow a

claimant in theory to recover unlimited benefits for a single loss far in excess of $50,000.  The court agrees.

To be sure, the plaintiff's argument does have a certain surface appeal.  After all, the policy read literally does indeed commit the defendant to pay up to $50,000 "for a loss assessment charged during the policy period," which is what the plaintiff experienced here by virtue of the Second Loss Assessment.  And while the policy by its terms caps benefits at $50,000 for any one loss "[r]egardless of the number of assessments," it does not explicitly state that this limit includes loss assessments charged in prior policy periods.  Read literally, then, the plaintiff's interpretation of the policy is understandable.  Nonetheless, the court finds consistent with the defendant's interpretation that the 2019-2020 policy's limitation provision must be read to include benefits paid for a loss during a prior policy period.

As an initial matter, the court presumes that the purpose of a policy provision purporting to limit an insurer's coverage obligation to a certain amount regardless of the number of loss assessments is to limit the insurer's obligation to pay no more than that amount, regardless of the overall total value of the loss assessments, or when those assessments were imposed.  To interpret the policy as the plaintiff urges here would upend this notion and indeed conceptually allow an insured to recover unlimited benefits for a single loss without limitation for any

loss assessment that might come to be charged during a future policy period.

Moreover, reading the policy as the plaintiff suggests could result in the disparate treatment of similarly situated insureds based solely on when their loss assessments were charged.  Under the plaintiff's interpretation, for example, an insured receiving an overall loss assessment of $100,000 through two $50,000 assessments, charged one month apart but during the same policy period, would be entitled to collect just $50,000.  In contrast, an insured receiving the same $100,000 assessment through two $50,000 loss assessments, charged one month apart, but with one assessment coming during one policy period and the second fortuitously coming during a successive policy period, would be entitled to collect the full $100,000.  Moreover, as noted above, the insured in this latter scenario would also going forward be entitled to collect up to $50,000 for the same loss event anytime a new loss assessment were to be charged during a future policy period.

The court declines to read the policy in a way that would effectively render the policy's limitation provision meaningless and provide for the disparate treatment of similarly situated insureds suffering the same amount of loss from a single event. "Contract interpretation 'depends heavily on context' and proceeds on the presumption that 'the parties were trying to accomplish

13

something rational.'"  *Wipro Ltd. v. Analog Devices*, 527 F. Supp.
3d 93, 98 (D. Mass. 2021) (quoting *McAdams v. Mass. Mut. Life Ins.
Co.*, 391 F.3d 287, 299 (1st Cir. 2004); *Fishman v. LaSalle Nat'l
Bank*, 247 F.3d 300, 302 (1st Cir. 2001)).  "[C]ommon sense is as
much a part of contract interpretation as is the dictionary or the
arsenal of canons."  *Teregram Corp. v. Marketwatch.com, Inc.*, 444
F.3d 1, 9 (1st Cir. 2006).  "Thus, a contract should be interpreted
in a manner that avoids absurd results and 'give[s] it effect as
a rational business instrument.'"  *Wipro*, 527 F.3d at 98 (quoting
*Homeowner's Rehab, Inc. v. Related Corp. V SLP, L.P.*, 479 Mass.
741, 751 (2018) (internal quotation omitted)).

Applying such common sense here, the court concludes that the
2019-2020's $50,000 limitation policy must be read to encompass
benefits paid for loss assessments during prior policy periods.
Although the policy's phraseology arguably supports the
interpretation offered by the plaintiff, that interpretation is
not a reasonable one given its potential to read the limitation
provision out of meaning and result in the disparate treatment of
similarly positioned insureds.  Accordingly, as the defendant has
already paid the plaintiff $50,000 for the 2017 fire based on the
First Loss Assessment charged during the 2018-2019 policy period,
she is precluded from collecting benefits in excess of this amount.
In sum, the defendant is not obligated to pay her under the 2019-

2020 policy.  The defendant therefore is entitled to summary judgment on Counts I and II.

      B. **Count III**

Count III alleges that the defendant engaged in unfair settlement practices in its handling of the First Loss Assessment and Second Loss Assessment, in violation of M.G.L. c. 93A, § 2. The defendant moves for summary judgment with respect to both loss assessments; the plaintiff moves for summary judgment regarding the Second Loss Assessment only.  For the reasons discussed above, though, the defendant's denial of the plaintiff's Second Loss Assessment claim was warranted because of the policy's limitation provision.  The defendant therefore is entitled to summary judgment on Count III with respect to its handling of the Second Loss Assessment.  However, summary judgment is not appropriate with respect to the defendant's handling of the plaintiff's First Loss Assessment claim because the record is not sufficiently developed to assess the merits of that portion of the plaintiff's claim.

The defendant argues that the plaintiff cannot sustain a 93A claim based on the First Loss Assessment because the defendant was entitled to investigate whether the plaintiff had knowledge of a likely assessment prior to increasing her loss assessment coverage.  An insurance company has the right to investigate such prior knowledge because if such knowledge exists, insurance benefits are not available to the insured.  *See, e.g.*, *SCA Servs.,*

*Inc. v. Transp. Ins. Co.*, 419 Mass. 528, 532-33 (1995) (insurable risk is eliminated if the insured knows, when it purchases a policy, that there is a substantial probability that it will incur or has already incurred a loss).

However, the current record is far from clear on whether Metropolitan's primary concern was that Brennan had previous knowledge of a likely assessment.  Rather, the record indicates that Metropolitan first maintained that Brennan had only $1,000 in loss assessment coverage.  Further, Metropolitan then failed to respond promptly to Brennan's inquiries, went back and forth on whether its legal department had rendered an opinion on her claim, and asked for documents from Brennan that it should already have possessed, and were in some cases of questionable relevance. Further still, Brennan filed her claim for the First Loss Assessment on May 2, 2019, and Metropolitan did not demand an examination under oath until over three months later, on August 27, 2019.  Given the defendant's delay and its alleged treatment of the plaintiff and her claim, a reasonable factfinder could conclude that the plaintiff's examination under oath was not based on concerns over her knowledge of a likely assessment, but rather reflected a last-ditch effort by Metropolitan to avoid paying Brennan's claim after its legal department concluded Metropolitan was otherwise obligated to pay Brennan $50,000.  A factfinder reaching such a conclusion could determine that Metropolitan

16

engaged in unfair settlement practices.  *Cf. Demers Bros. Trucking, Inc. v. Certain Underwriters at Lloyd's, London*, *Subscribing to Certificate Nos. IM MA 04-124*, 600 F. Supp. 3d 265, 284 (D. Mass. 2009) (where insurer allegedly requested documentation that was irrelevant or readily available, unnecessarily delayed payments, and misrepresented the policy terms, a genuine issue of material fact existed as to whether the insurer's claim settlement practices were unfair).

To be sure, Metropolitan also argues that Brennan has suffered no cognizable injury under 93A where it ultimately paid her full claim on the First Loss Assessment.  Although the plaintiff does not address economic damages in her brief, her complaint alleges that she was compelled to hire an attorney and incur legal fees and costs associated with producing over 400 documents to Metropolitan as a result of being forced to undergo the examination under oath.  (Compl. ¶¶ 90-93).  She also alleges that she had to take out a loan to pay the First Loss Assessment.  (*Id.* ¶ 99).

Under Massachusetts law, "'[i]f a c. 93A violation forces someone to incur legal fees and expenses that are not simply those incurred in vindicating that person's rights under the statute, those fees may be treated as actual damages . . . .'"  *Montanez v. 178 Lowell St. Op. Co.*, 95 Mass. App. Ct. 699, 703 (2019) (quoting *McLaughlin v. Am. States Ins. Co.*, 90 Mass. App. Ct. 22, 33 (2016)).  The costs Brennan alleges she incurred in connection

17

with the First Loss Assessment were not those incurred in pursuing a 93A violation, but instead were incurred because Metropolitan delayed payment for months and demanded that Brennan be examined under oath before it would pay her benefits beyond $1,000.  Brennan has accordingly alleged a sufficient economic injury to state a 93A claim on the First Loss Assessment.  *Cf. McLaughlin* (attorney fees incurred in prosecution of underlying tort suit constituted damages under 93A).[4]  Summary judgment therefore is not warranted on this portion of Count III.

### C. Count IV

Metropolitan moves for summary judgment on Count IV, which alleges that it violated the covenant of good faith and fair dealing in its handling of the two loss assessment claims.  To prevail on a breach of the covenant claim, a plaintiff must show that a defendant exercised bad faith or an absence of good faith in performing under the parties' agreement or contract.  *Lass v. Bank of America, N.A.*, 695 F.3d 129, 138 (1st Cir. 2012).  Evidence that a defendant acted to gain an advantage for itself can support a breach of implied covenant claim.  *Id.* (citing *T.W. Nickerson, Inc. v. Fleet Nat'l Bank*, 456 Mass. 562, 574 (2010)).

---

[4] The court presumes that the plaintiff presented the defendant with a 93A demand letter regarding the First Loss Assessment.  *See McDermet v. DirecTV, LLC*, Civ. A. No. 19-11322-FDS, 2021 WL 217336, at *15-16 (D. Mass. Jan. 21, 2021) (demand letter is a prerequisite to a 93A suit).

Without repeating the foregoing, and for the reasons noted, the defendant is entitled to summary judgment regarding its handling of the Second Loss Assessment. However, summary judgment is not warranted regarding the defendant's handling of the First Loss Assessment where discovery has not yet commenced and the plaintiff has alleged facts which if proven could support a finding that the defendant failed to act in good faith.

### V. <u>CONCLUSION</u>

For the reasons stated above, the plaintiff's motion for summary judgment is DENIED. The defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Specifically, summary judgment is entered on Counts I and II. Summary judgment is also entered on Counts III and IV, but only with respect to the portions of those claims regarding the Second Loss Assessment. The motion is otherwise denied; counts III and IV will thus go forward with respect to the defendant's handling of the First Loss Assessment.

/s/Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED: May 23, 2022